It's another easy fix. This JP Morgan case impresses me. It's on the 20th street. It's going to work for me. You want to wait just a moment until everyone gets settled. I'd also like to know how the parties plan to split their time. Is the Our Children's Earth Foundation, will there be one or two lawyers arguing? Two lawyers, Your Honor. And how do you plan to split your time? May it please the court, I'm Michael Graff, and I'm appearing for Our Children's Earth Foundation, an ecological rights foundation. I'm joined by my co-counsel, Mr. Sproul, and I'm going to present for approximately 10 minutes. Then Mr. Sproul is going to add some additional presentation for five minutes. And then we would like to reserve five minutes for rebuttal. All right. Do you have the nature split up? You know, it's a little difficult. We don't know who to ask questions of. We don't have a scorecard. Yes, Your Honor. Your Honor, my presentation was going to focus on why EPA's current method of promulgating and revising effluent guideline and limitations is contrary to congressional intent in establishing a technology-based regulatory system for point source discharges. My co-counsel, Mr. Sproul, will then address the issue of subject matter jurisdiction in relation to our specific claims. Thank you. Your Honor, I agree with you. It was a little vexing for us to try to figure out how to split this up. All right. So does this just go? You start. Okay. You start. Once we clean out the housekeeping cobwebs, you'll see. Okay. Well, maybe the clerk could put on 10 minutes now. I'll help you. We'll go down. You go down. And then it will be five. All right. You may proceed. Thank you. In this case, our position is that EPA has abandoned the technology-based regulation in favor of a hazard or risk-based approach, which has no statutory support in the 1972 amendments to the Clean Water Act, which are the current law. The 1972 Clean Water Act amendments do not authorize EPA to regulate point source discharge based on the environmental risk posed by a discharger. Instead, the objective of the 72 amendments was to eliminate the discharge of pollution in our nation's waters. And there's specific Clean Water Act provisions that require EPA to periodically identify and identify any available technology control measures which could eliminate pollutants for effluent guidelines, effluent limitations, and for new source standards. Those are in sections 301B, 304B, and 306A. Well, let's assume we agree with you. It's a question of duty. Isn't the question of whether or not they breached that duty a question that the district court should handle first? It's a question of fact. Let's assume we agree that there is a duty, but whether or not they breached that duty would be a question of fact, would it not? I'm sorry, a question of? Fact. A question of fact, yes. Well, I think that the district court did purport to address that duty by saying that EPA's review of effluent guidelines, they had done a review, and therefore the district court found that that was in compliance with the Clean Water Act. And we believe it would be a question of law as to whether that was actually true, because the law is, we believe that the law is pretty clear as read together these different provisions, that there are specific duties that are encapsulated within the duty to particularly review effluent guidelines and limitations. That is, there's. That's really, to me, the first question you have to go over, and that is, within these statutes, we have mandatory and discretionary aspects. So what I'm trying to puzzle through, and maybe you can help me, is we know everyone in EPA agrees that a review is mandatory, and it has to be annually, and you can fight about the timing. But so EPA says, yes, we agree with that. We have to review it. We have to do it annually. And then comes the next question is, is the best available technology or some variation on it part of the standard for the mandatory review, or does that get you into the discretionary of whether or not they did it or not? That's a good question, Your Honor, and that does cut to the heart of it. And let me just say, first of all, there is no factual dispute here that EPA has not reviewed the available technology for over 95 percent of the industrial categories. We're not going to get to our question, though. I just wanted to present that point, though, in response to Judge Nelson. Yeah, okay. Okay. We know our question. The dirty water facts. Got you. I think the response to your question goes to in considering their obligation to review effluent guidelines, they have to, if you, I'm sorry, I have to get composter again. I think that the trick here is that we are not challenging EPA's identification of a technology-based standard that they decided not to adopt. We're challenging, as a matter of law, EPA's position that they don't have to consider technology as part of their overall review of existing effluent guidelines under Section 304B and 301D. Now, the Bennett v. Speer case talks a little bit about this concept of, that is, mandatory duties embodied within a mandatory duty. Mandatory procedural duties embodied within a procedural duty. In that case, it was an Endangered Species Act case. And I think one of the agency had not considered economic impacts when designated in critical habitat or there was some issue like that. And the court said specifically that is a mandatory duty which triggers the citizen suit provision and the mandatory duty provisions of the ESA. Just like that provision is the – Can I just stop there just because generalities aren't going to help us. That's the Endangered Species Act, which has its own interpretive issues. There is a mandatory duty to review and revise, if appropriate. Would you explain why you think that this mandatory review at that level, the mandatory level, incorporates, by virtue of statutory construction, the principle of at least considering the technology issue? Well, I think that under general principles of statutory construction, you have to consider all the provisions of the Clean Water Act, particularly Section 301B, 301D, 304B, and 306, which establishes the New Source Performance Standards as a cohesive unit of provisions which establishes a technology-forcing aspect to achieve the statutory intent to eliminate pollutants. Now, we cite the Wangahila case. Before you get into the cases, there has to be a clear showing in the statute that it's mandatory. And I'm trying to find the clear showing in the statute. Before we get to the cases, we're going to look at this statute. And if it's not clear, then it's up to the EPA to determine how they're going to go about it. They have to do it, but how they go about it. Can you point to what section you specifically rely on that indicates that there is a mandatory requirement to use the best technology? What sections? How do you patch that together so it's clear? Let me just go to the Wangahila case for just a moment. It just says that a mandatory duty can arise from a Chevron construction, that is a construction of a statute using general principles of statutory interpretation, which include different provisions. Okay? And we have looked at the provisions. Section 304B requires EPA to establish best available technologies and to review and revise, if appropriate, those technologies based on an annual review. 301D requires those reviews to be incorporated into a five-year effluent limitation review, which then also incorporates that, and then these all become incorporated into a 301B effluent limitation. All this information is then processed by EPA to establish new source performance standards under Section 306. Stop right there. Okay. Sometimes we don't use the agency sections, but if you look at 1314B, effluent limitation guidelines, and if I am just sorry, I want to make sure I understand it. The crux of your argument is that if you read through all of Section B, it keeps saying technology, technology, technology. Is that fair to say? Yes. So my question then is, as a matter of statutory interpretation, all the little subpoints about technology come under, if you have a regulation, the regulation better do all these things. How do you import those subsections of B into the mandatory duty? What is the statutory construct? Well, I think that the statutory construct comes from the question of whether it's appropriate to revise the effluent guideline and also effluent limitations. It's appropriate if there are technological advances which meet the new updated standards for best available technology or best control technology. Is there something in the statute you can point to? Well, the statute is your view, but we have to look at the statute and say, is it clear? And I don't – I want to get your best argument. Why is it clear? Well, I think it's clear if you go back to the actual intent of what the statute is trying to do, which is the statute is using technology to eliminate pollution. It's not using risk-based analysis to limit pollution. I mean, that is what the statute says. It doesn't say – there's no support, there's no authority for EPA to revise, to decide whether it's appropriate or not to revise guidelines based on whether an industry is having significant risk or not. I mean, that's just not the way the statute is set up. That's not the way the statute is constructed. And so for EPA to say, well, we have to establish effluent guidelines and limitations according to a certain set of factors, but then we can throw those factors out the door when we consider whether it's appropriate to revise or not, I mean, that's just contrary to the entire technology forcing of the statute. To the point of Judge McKeown's question, we know they have to give a report. The question is do they have to use the technology or do they have chevron deference to set that up the way they want to? And you say, well, it's all through the statute. Well, can you be more specific as to where the incorporation takes place or the reference takes place? Your Honor, I'm now over my 10 minutes, and I think it might be appropriate now for Mr. Sproul, who actually was going to talk about jurisdiction. The only question in front of us, and maybe we should have him address that then. Okay. All right. Thank you. Christopher Sproul for Appellants, Our Children's Earth Foundation et al. May it please the Court. I would just maybe briefly follow up on the question that was pending, as I think this is the heart of the matter, and it gets down to this, that as this Court has said in many cases, as the Supreme Court has said in the Dole case that's cited in our brief, in interpreting a statute and determining whether language is plain or has a plain meaning, you look to the whole context of the statute and the purpose and policy of the statute. It's true that if you just focus on the words, if appropriate, in isolation, there isn't text that exactly says, well, if appropriate means you have to do a technology-based review and you have to consider these effluent guidelines. But it would do violence to Congress's central intent in enacting the statute to hold that in reviewing whether it's appropriate to revise effluent guidelines, that EPA wouldn't have to consider the things that EPA had to consider in the first place in deciding whether to promulgate effluent guidelines. Is this a question of where such a challenge should be reviewed, whether it's in the district court or on a direct petition to the court of appeals? So in other words, if we interpret the revising as appropriate, that the decision whether to revise has to include a mandatory look at technology, then that would be under a citizen suit provision in the district court, correct? That's absolutely correct. And that's our contention. Can I just ask you, if we interpret it a little bit differently and we said, well, you've got to have an annual review and we don't know what the standards are, but let's say EPA does its review and then the if appropriate is discretionary, and the court were to say, but the challenge appears to be that there was an abuse of discretion because in determining if something was appropriate, they didn't go down and look at all the little subpoints, where would that review be? How would that case be brought? That's an excellent question. I think that then it probably would be best characterized as a claim under the Administrative Procedure Act rather than a mandatory Clean Water Act duty case under Clean Water Act Section 505. But we did plead the APA is an alternative basis for jurisdiction. Still, it would be in district court. Then it would come from the agency up to us directly, correct? Our view, under the City of Las Vegas and so on, that district court review under the Administrative Procedure Act would be appropriate, because court of appeals jurisdiction is very narrowly prescribed under this Court's precedent, under D.C. Circuit, the Longview Fiber decision in this circuit, that unless Clean Water Act Section 509's specifically identified EPA actions that relate to specifically enumerated Clean Water Act sections are at issue, then there's no court of appeals jurisdiction, that those provisions, Clean Water Act Section 509's jurisdictional provisions are to be strictly and literally construed. Well, if I look at subsection M and it talks about you have to establish a review and revision, I can see that's mandatory. And then it says in accordance with subsection B. And then that's where I need some help. Is it in accordance with all of B or part of B? Well, I would say, again, it's in accordance with all of B, that that's the necessary and reasonable interpretation to give effect to Congress's intent. I mean, if there's any issue about, well, that language is ambiguous, well, then the judicial task is to turn to the legislative history. And the legislative history couldn't be clearer that Congress found that the pre-1972 Clean Water Act regime was a dismal failure. And this is exactly what EPA has returned to. Let me don't leave that section for a minute. It says establish a schedule for the annual review and revision of promulgated affluent guidelines in accordance with subsection B of this section. And we don't know what in accordance with subsection B of this section refers to. An argument could be made that it refers to the word schedule. And if that's true, then it does not incorporate the problem that you're pointing to. So if we get to the place that there are two logical interpretations, isn't that when we turn to the administrative agency and say, you better sort this out and we'll take it if you're wrong under EPA? But, again, it's Supreme Court precedent, the Chevron NRDC decision, Brand X, that discretion to an agency interpretation of a statute is only appropriate if that interpretation is reasonable. Okay. Come back then. Why isn't it reasonable establish a schedule in accordance with subsection B is a logical interpretation of sub A of M1? Because the affluent guideline planning process as provided for in 304M doesn't comport with what couldn't be clearer about Congress's intent to have a technology forcing regime. I hear what you're saying, but point to the wording and tell me why that is unrealistic. Well, again, it gets back to interpreting the statute in context as a whole. Okay. But the wording itself, the wording itself, would you agree, is ambiguous in sub A? There's potentially some ambiguity. Again, I mean, our position is that that ambiguity is resolved when you look at the statute as a whole. Now, the statute as a whole may tell you something, but the question is whether that subsection A is ambiguous in interpretation. Are you in a position to take a place, a position on that issue? Well, again, I feel I'm being a little repetitive, but our position is that when you look at it in context as a whole, it's not ambiguous. In context as a whole, but I'm getting you to focus on sub A. Just looking at sub A, is that language ambiguous or clear? If you look at it in isolation, I would concede there's some ambiguity. Let me ask you one other question. This bothers me. I know you've run over, but we have to determine our own jurisdiction. I'm a little curious because you brought a motion to bring something up here, which was denied by the district court because an appeal had already been filed. I'm wondering what that something is that's back in the district court. And what I have in mind, I don't think there's a 54B order in the file, of whether the district court still has something before it which would interfere with our jurisdiction on a piecemeal appeal. What is there that you were trying to get up to us in your motion which was denied? Well, I think that all matters are presently before the court, this Court, and there's nothing left remaining before the district court. But the district court had held, its parting lines couldn't be clearer. We don't have total jurisdiction. The district court is saying this. We don't have, I don't have total jurisdiction over the claims presented by plaintiffs now appellants. Some of these issues must be. You also filed also the APA in 1331. That has not been ruled on by the district court. And then you ask them to bring everything up here. And my question is, is there something still in the district court that's pending before the district court which would interfere with our jurisdiction? Well, the district court, I thought the ruling was clear that she was granting judgment on the pleadings slash summary judgment to the government on all our claims. I mean, she did – there is that line where she says I'm not reaching the APA, but I think the clear implication was since she was granting total judgment to the government, she found it unnecessary to reach that. She found alternative bases for granting judgment in whole to the government, leaving nothing still pending before the district court. Thank you. Are you splitting your time with the Association of Metropolitan Sewerage Agencies? Yes, Your Honor. We'll be using 14 minutes, and the two intervener groups will use three minutes each. All right. So if you would set the clock at 14 minutes, please. And you're saving no time for rebuttal? No. Oh. Sorry. Responded. I'd be happy to. You don't get any rebuttal. Sorry. May it please the Court, my name is Alan Brabender with the Department of Justice, and with me today is Pooja Parikh of the EPA, and we represent EPA and its administrator in this appeal. Jurisdiction under the Clean Water Act citizen suit provision is extremely narrow and is not the appropriate mechanism to challenge the substance of EPA's decisions. On that question, let me pose a question. You cite to Norton v. Southern Utah Wilderness, but isn't Norton distinguishable because the Clean Water Act contains very specific directions concerning how the EPA is to conduct its yearly, its biannual, and five-year reviews. So isn't Norton clearly distinguishable? Well, first of all, Norton involved a mandatory duty claim under the EPA under 706-1 to compel an agency action, which is similar to the Clean Water Act's citizen supervision. But the Court in that case said it left the manner of its action to the agency's discretion. In this case, it was the Clean Water Act imposed a laundry list of very specific requirements. Well, the Clean Water Act does have a laundry list of specific requirements, but none of those requirements apply to the act of review. There is no requirements governing EPA's review that were found anywhere within the Clean Water Act. Those requirements apply to the act of revision, and EPA would – EPA agrees that it must consider technology when deciding whether to revise affluent guidelines. But there are no criteria. In fact, Congress left it up to EPA to set the criteria for its review. Well, I guess that, you know, if I can characterize what I think the argument against that is, what they're making is that it doesn't make any sense to say, oh, you have a mandatory review, but it's standardless. And the only way to really characterize the review is to impute the standard that runs all the way through the Clean Water Act. Because otherwise you could say, oh, I reviewed it, next. Well, perhaps you could – the problem is here, though, is it's not a clear-cut mandatory duty. So perhaps it could be – that claim could be brought under the APA. But when we're talking about a mandatory duty in a citizen suit, there must be clear-cut obligations over which EPA has no discretion to implement. And it's OCE's burden, the appellants, to point to the statute where that duty is located and to show that EPA has no discretion in implementing that duty. And to make this showing – If you go to M, which seems to be one of the disputed provisions, it says you have to establish a schedule for the annual review and revision of guidelines in accordance with subsection B. So why isn't it reasonable to read that as the schedule for the revision must encompass all the things that are listed in B? Because it doesn't say just paragraph 1 of B. It just says B. And then the same is true of the other kind of cross-references to B. Why doesn't that mean that you have to at least take this into account? And then if you don't take it into account, that's your mandatory duty you have to take into account. To the degree to which you take it into account may be discretionary, but you must take it into account. Well, EPA's position I think squares with what Judge Wallace said, that the subsection B language in M refers only to schedule. And I think, moreover, with all due respect, Your Honor, you're reading a lot into subsection B. It doesn't say, for instance, EPA shall schedule for annual review and revision in accordance with the technology-based factors of subsection B. Subsection B contains a lot of requirements, and it's just really too broad to read that specific language into that, into 304M. Well, I mean, that's the only challenge being made here. Maybe there are other challenges to be made. So I'm just taking the challenge they've made. And the question is, with respect to statutory interpretation, you know, what does B mean? And if B means just it has to be annual, well, it already says it's annual, so what does B add to it? Well, I think B is modifying which annual review we're talking about. It's the review from subsection B of 304. And I think getting back to what a mandatory duty is, and it's a clear-cut duty. Well, let me just stop there. If it only talks about schedule, if M, the reference in M is only as to schedule, for the annual review, and the only part of B that you think it cross-references relates to an annual review, that makes, that kind of runs afoul of the canon of surplusage. So it already said annual review, so it can't be just referring to subsection B meaning an annual review. It has to mean something more than that. So what does it mean? No, I mean, I think what I'm trying to say, I'm probably not getting across as clear as I could, is that the reference to in accordance with subsection B is referring to which annual review Congress is talking about in subsection M. It is the annual review referred to in subsection B. And I would just like to also comment on the fact that we're all going to have to But unless we can figure out what it means, then he gets into the non-mandatory because it's not clear-cut. That's your argument. Yes, Your Honor. You articulated that better than I did. So just looking at M, A, I don't know what that means, but I think that if it means than what the plaintiffs are contending, that it has to have some tie-in to a schedule. And I don't quite understand your argument that it says at least annually that that is the schedule. What schedule is it going to add to the words annually? What is that schedule? Well, the schedule is the schedule for the annual review. So the plan comes out, for instance, in September 2nd, 2004. The 2004 plan came out. And so the schedule then is the schedule for the 2005 and 2006 annual reviews when EPA is going to conduct those annual reviews. Well, it starts just before it, within 12 months. Does that schedule mean that that 12-month is then going to be the annually? That is, it isn't necessarily a calendar year. Is that an interpretation? Well, within 12 months refers to February 4th, 1987. And so the first plan was supposed to come out 12 months after February 1987. Okay. So if we go, if you're supposed to, now you have a plan. You've kicked off 1987. We keep going biannually after that. If you're supposed to establish a schedule and then you read out the rest of it, you have to establish a schedule. In accordance with subsection B, the schedule for the annual review, well, what does B add if you don't have it looked at as a whole, all of B? Well, if we, if the cross-referenced subsection B, we then will turn back to B. And in accordance with B, in subsection B, all EPA's obligation is to do is to perform a review. And that is, of course, what EPA has done here. It's performed its review. That does not. But now you're adding to the language of N. So you're saying it's a schedule for an annual review and it's and revision in accordance with subsection B. So that's a shall obligation. You have to establish a schedule for review and revision, and that has to be in accordance with subsection B. All right. Well, right. I guess I'm not, I don't fully understand the courts. Well, the problem is the statute, and maybe that will be my question. But you can't just say you have to establish a schedule. Judge Wallace said, well, maybe it just means schedule. It only modifies schedule. If you say you have to establish a schedule in accordance with subsection B, does that make sense? I believe that is EPA's position. And how, why does that make sense? What is the schedule under subsection B? The schedule under subsection B appeared in the, for instance, in the September 2nd, 2004 plan, which then set out when EPA and how EPA was going to conduct its annual reviews under subsection B. But subsection B says at least annually thereafter and revise if appropriate, not just set up a schedule, but revise. What does that mean? Well, there's two different obligations in 304B. One is to review, and then if it's appropriate, EPA then determines which guidelines it will or may be appropriate to revise. If EPA determines it is appropriate to revise a guideline, EPA then schedules a rulemaking. And then during the rulemaking, it considers the technology-based factors of 304B, among other factors it determines appropriate. So it's not going to determine whether it might be appropriate to revise. If it's doing a review, is the review with an eye towards whether it's appropriate to revise? What is the review? Correct. The review is basically agency priority setting because there are 56 existing categories and 450 subcategories, and EPA simply cannot review or revise all of those guidelines each year. It takes years for rulemaking for just one subcategory. And so it has to have the discretion to set its priorities as to which ones it's going to revise first. But within its discretion, must it consider technology? During the revision and rulemaking process, yes, it must. But how can you see it's just like one of these Mobius strips. How can it figure out whether it might be appropriate to revise if it doesn't have some benchmark for its review? Because its review is geared toward maybe I should revise in order to update the technology, et cetera. But how can it even make such a decision, which it's mandatorily required to do, if it doesn't If it excludes technology? Well, it doesn't exclude technology. And we disagree with the fact that EPA didn't consider technology in its review process. In fact, it did consider technology. And if this — if whatever, perhaps, go back to the district court, EPA would show that or in the process of a petition for review would show that it, in fact, did consider technology in its review. Let me ask you about that possibility. If we were to determine that in order to make common sense out of the statute, you just couldn't say review in the abstract. It has to be some kind of review, and it were a review that must include the technology factor. And we wouldn't decide that because that's not been decided by the district court. If we were to send it back to the district court, then your position would be you would put forth in the district court that you, in fact, did consider it in some fashion. Right. And that would satisfy your duty if we were to determine that was a duty. That's correct. But I would respectfully, I guess, disagree with the fact that there is a clear-cut obligation in 304B to review in any particular. Tell us, you say that you do use technology. What is the difference between a technology review and the current review that you provide? Well, I guess the technology-based review, I'm not exactly sure what OCE wants us or wants EPA to do. But I assume that they want EPA to consider all factors within 304B and basically conduct a rulemaking similar to basically conduct a rulemaking for all 56 existing categories each year. Well, maybe you could help me. What's the difference between what the appellants are asking for and your hazard-based approach? Well, EPA's hazard-based approach is it's a multilayered approach. So that first EPA, during a screening process, assesses the hazard of the 56 existing categories and ranks them according to their hazard. It also considers other factors such as when the last time the guidelines were promulgated, the number of facilities in an industrial category that are contributing to the hazard. And then based on that ranking, it considers the greatest hazards in a detailed review. And there it does consider the technology-based factors. And also, if the record were ever certified in this case, there would be multiple documents showing that EPA did, in fact, consider technology in its review. So let me just get your position straight. Your position is you don't have to, but you do. Is that right? That's correct. Okay. And I am over my time. Within your discretion. Within our discretion. Is that correct? As long as we don't abuse it at our discretion. Okay. Thank you. Thank you. By the way, do you take a position on whether we have jurisdiction? No. This Court does not have jurisdiction because there's a lack of final agency action. I mean, because there's something left down below and we have no jurisdiction? No. I believe the district court disposed of all claims below. Okay. We'll set the clock at 3 minutes. Is that correct? You're sharing your remaining 6 minutes with your other interviewer. May it please the Court. My name is Frederick Andes. I'm counsel for Intervenor to Appellee, the Effluent Guidelines Industry Coalition. There are a couple of points that we think are worth making here. One is that if Congress had wanted to create a clear non-discretionary duty here, they could do it. They did it in other provisions of the Clean Water Act, in the Clean Air Act, in other environmental statutes. They did not do that here. And bear in mind, as to 304M, that provision was created 15 years after the statute was first enacted. There was plenty of history as to effluent guidelines. They knew how long effluent guidelines take to develop. If they had wanted to conduct a comprehensive review every year of all 56 guidelines, they could have required that. They didn't require that. And in our mind, that makes sense they didn't require that, because as counsel for EPA said, the process for developing a single effluent guideline for a single industry can take 5 to 10 years, massive amounts of resources. It strains credulity to think that without any indication, Congress intended for EPA now, in 1987, to start reviewing every single guideline every year. Counsel, how would you define the purpose of the Act? The Act has several purposes. The Act has technology-based provisions. It has water quality-based provisions. And the goals of the Act are not perfectly represented in the specific statutory requirements. What we found in 35 years of working with this Act is that the actual provisions that Congress wrote don't always reflect complete fulfillment of the goals, but we have to stay with the statutory requirements as they're written. But doesn't it seem odd that you would have to look at technology-based considerations with respect to new things, but not with respect to preexisting rights? Well, we think, again, that you need to separate review and revision and say when existing guidelines are revised, and we think that's reflected in M1, you do have to look at those factors when you are revising a regulation. But Congress didn't really speak to what factors it wanted EPA to take into account in doing this review. And in thinking about, well, why is it that they repeated in M what they said in B, I guess part of my perspective on that is that there are many instances in the statute where EPA was supposed to do something and years later they still hadn't done it. And there are a number of provisions in the 87 Act, and I was involved when that happened, where Congress in essence said we really mean it, we really want you to do it, and we want transparency. 304M, I see, is a transparency provision that said you're supposed to be doing this review. We want you to be up front and establish a schedule and tell everybody what you're doing and when you're doing it and why. And if they wanted to change the substantive standards for review there, they had the ability to do that. They didn't do that. I try to look, you know, some legislative history on that. In your view, is there legislative history that supports that that is the impetus or the intent of subsection M? Well, I think counsel following me will speak to some of the legislative history. Thank you. Your time is up. My time is up? Thank you very much. It's a perfect time to transition. Thank you. Thank you. May it please the Court, I'm David Birchmore, appearing for the National Association. Give him three minutes as well, please. National Association of Clean Water Agencies, and I would like to touch just very quickly on the legislative history and the structure of the Act and try and clear things up. This touches on the question of whether this Court has jurisdiction today to even consider the voluminous arguments and documents that have been submitted by the appellants. We don't believe they do. We believe that all this Court can do today is affirm the judgment of the district court judge, Judge Hamilton, which actually I think is a model of clarity and conciseness and got it exactly right. It's been established for over 30 years since the Supreme Court's decision in DuPont that exclusive jurisdiction to review both affluent limitations and affluent guidelines, or this hybrid that they call affluent limitation guidelines, rests in the Court of Appeals under Section 509 of the Clean Water Act, not a mandatory action citizen suit under 505. Prior to DuPont, only the Eighth Circuit had suggested affluent guidelines could be reviewed in district court, and all the other circuits, the Third, Fourth, Seventh, Tenth, and D.C. Circuits had ruled that they should be reviewed in the Court of Appeals, just like affluent limitations. After DuPont, the Eighth Circuit reversed itself, so now the Supreme Court and all the circuits are unanimous that this case that's been brought by the appellants, if it should have been brought in the Court of Appeals, and it wasn't. It was brought in district court. The district court may have exceeded its own authority. I think it's arguable, but it may have exceeded its own authority by suggesting that it could even rule on the mandatory duty issue. But assuming that it could, it ruled correctly on that. Do you think that the court can determine under a Citizens Act whether something is a mandatory duty or not? Yes, it can. Let me concede that point and say that the district court had that limited jurisdiction. That's how Judge Hamilton ruled. She said, I have that limited jurisdiction to determine whether there was a mandatory duty and whether they've done it. The issue as to whether they've done it properly, whether the review has been conducted in the manner that it should have been reviewed, rests only in the Court of Appeals. So we have 30 years of case law saying that, and we also, I think, have a conclusive bit of legislative history, which we cited in our brief on page 17 of our brief. In 1977, right after the DuPont decision, Congress added to Section 304 of the Clean Water Act a one-time obligation for EPA to go out and review and revise, if appropriate, all the existing effluent guidelines. That's not codified in the rule. It's in the notes to the rule. And if you go to USCA, it's because it was a one-time obligation. And it says very clearly in there that EPA should publish the results of its review and its decision whether or not to revise, and that that review and that decision whether or not to revise would be reviewable in the Court of Appeals under Section 509 of the Clean Water Act. So I think that's dispositive, in my view, that this case should have been filed, if at all, here in the Court of Appeals. The thing which, I'm sorry, is Judge Wallace was asking about what might be left, what were they asking them to bring up? I think what the appellants asked the district court judge to transfer was, well, if I don't have jurisdiction, can I just transfer the whole case up to the Court of Appeals and cure the flaw, the fact that they failed to file this in this Court in the first instance. They never filed it. They didn't meet the 120-day jurisdictional time deadline to file it. And so these arguments are not currently before the Court. Thank you. Thank you, Your Honor. You've exceeded your time, but we'll give you two minutes for rebuttal. First, to return to the discussion about 304m1a scheduling a review in accordance with Clean Water Act Section 304b, the review that's scheduled is a review which culminates in a decision, which is whether it's appropriate or not appropriate to revise the affluent guidelines. Again, the only reasonable interpretation of that language is that EPA has to take into account the factors that it would need to know whether its current affluent guidelines still define best available technology. If the review doesn't allow them to know that, which their current methodology does not, then they're behaving irrationally and contrary to the statutory purpose. So I think that's the only tenable interpretation of that language. I also want to point out the just ‑‑ I think it's important to kind of keep in context the practical results of EPA's methodology. EPA was sued in the early 90s. They entered into a consent decree with NRDC. There were several affluent guidelines promulgated over that decade. That consent decree has expired. EPA has reverted to the pre‑1972 approach of we're not going to impose new affluent guidelines unless we can find that someone is risky. EPA is now four years plus into that process. There have been no new affluent guidelines and no revision of existing affluent guidelines. EPA is bogged down in this morass of trying to find out who's relatively more risky. Do you challenge that in an administrative process? I think that would be another vehicle to bring that. Wouldn't that really be the vehicle to be saying that, you know, you may be bogged down, you're either abdicating your obligation to at least consider or you're doing it inappropriately and how you're doing it is an abuse of discretion, and then that would come up to the court of appeals? I think that would be an alternative vein here. But there's the Clean Water Section 304M Affluent Guideline Planning Process. That creates a document which is challengeable, which we ‑‑ again, there's a mandatory duty to have that plan. We sought review of that in the district court. You've got to a point that's bothered me. I know I'm running you over, but I better ask it. Traditionally, we've relied on the APA and have an administrative agency do some screening because we, as a court, as a district court, as a court of appeals, we're not very good at deciding whether it's technology based or not and what the current technology is. And everything has gone through administrative agencies so that they, the experts, can look at it and then we'll see if they've abused their discretion. Here in this case, you seem to be arguing that it's mandatory that we get into the technology issue without the screening of an administrative agency. Isn't that sort of counter to the way the law has been developed? And if so, should that be way upon how we decide this case? A fair question, and I would say that it gets back to a question that was raised earlier about perhaps there should be a remand to the district court for further fact development. I think the answer to both questions is the same. The facts are unassailable, as the district court found. There's no controversy here. The EPA has not engaged in an assessment of the technological capabilities of American industry.  Why is industry still posing substantial risk to the environment? That's a pure question of law. I think that that's something that the judiciary is eminently qualified to decide, is that legal methodology. I would concede that if we were getting into an elaborate factual inquiry about, well, EPA thinks that a biological treatment plan is the best available technology for a pulp mill, and is that a reasonable judgment or an unreasonable judgment, that one would need a record. But that's not the case here. Thank you. The case just argued is submitted. Thank all counsel for your arguments.
judges: Wallace, D.W. Nelson, McKeown